UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTHWEST MARINE INCORPORATED, a dissolved California corporation;<br><br>    Plaintiff,<br><br>v.<br><br>RAYMOND MABUS, Secretary of the Navy,<br><br>    Defendant. | Civil No. 3:12-cv-0526-GPC-WMC<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART THE NAVY'S MOTION FOR SUMMARY JUDGMENT, (ECF NO. 22);**<br><br>**(2) GRANTING IN PART AND DENYING IN PART SOUTHWEST MARINE INCORPORATED'S CROSS-MOTION FOR SUMMARY JUDGMENT, (ECF NO. 27)** |

## INTRODUCTION

Before the Court in this appeal of a decision by the Armed Services Board of Contract Appeals ("ASBCA") is defendant Raymond Mabus's ("Navy") Motion for Summary Judgment, (ECF No. 22), and plaintiff Southwest Marine Incorporated's ("SMI") Cross-Motion for Summary Judgment, (ECF No. 27). Both parties have filed replies in support of their respective motions. (ECF Nos. 30, 31.) The Court finds the motions suitable for disposition without oral argument. See CivLR 7.1.d.1. After a review of the parties' briefs, administrative record, and applicable law, the Court will **GRANT IN PART AND DENY IN PART** the Navy's Motion and **GRANT IN**

**PART AND DENY IN PART** SMI's Cross-Motion for Summary Judgment.

## BACKGROUND

This case centers on a 1985 contract between the Navy and SMI's predecessor-in-interest, Northwest Marine Iron Works ("NW Marine"), for the overhaul of the U.S.S. Duluth, a naval ship. After NW Marine completed performance on the contract and was paid for its work, the Navy determined it had overpaid NW Marine because some of the costs NW Marine incurred while performing the contract were later forgiven by NW Marine's creditors following bankruptcy proceedings.

After a lengthy procedural history, the Ninth Circuit determined the Navy was entitled to some reimbursement in light of the debt concessions NW Marine obtained from its creditors. The Ninth Circuit thus remanded the matter to the ASBCA to determine the quantum owed to the Navy in light of the debt concessions.

The ASBCA determined the amount of the debt concessions attributable to work on the Duluth (and therefore creditable to the Navy) to be $1,728,522.[1] After considering payments made from the Navy to NW Marine and applying certain adjustments, the ASBCA determined the amount owed the Navy $1,104,479, plus interest from August 14, 1989, through the date of payment. (A34.) Disagreeing with this outcome, SMI filed the instant action for review of the ASBCA's determination.

### I.  Factual Background

The underlying facts of this case are fully set forth in the decision by the Honorable Irma E. Gonzalez, U.S. District Judge, and the Ninth Circuit's review of that decision, and do not bear repeating here. See Dalton v. Sw. Marine, Inc., 1998 WL 919360, at *2-4 (S.D. Cal. Aug. 27, 1998); Sw. Marine, Inc. v. Danzig, 217 F.3d 1128, 1132-35 (9th Cir. 2000). The relevant facts for purposes of these proceedings pertain to specific contract provisions and specific dollar amounts used in calculating the reimbursement owed to the Navy as follows.

---

[1] This amount includes a portion of the debt concession by Oregon's State Accident Insurance Fund ("SAIF"). SMI asserts this debt concession should not have been included as a credit to the Navy. Indeed, this assertion forms the basis of Count III of SMI's Complaint. (Compl. ¶¶ 71-77.)

**A.     Contract & Relevant Clauses**

The contract at issue is a fixed-price incentive contract, which the Federal Acquisition Regulation ("FAR") describes as:

> a fixed-price contract that provides for adjusting profit and establishing the final contract price by application of a formula based on the relationship of total final negotiated cost to total target cost. The final price is subject to a price ceiling, negotiated at the outset.

48 C.F.R. § 16.403(a). More specifically, the contract at issue is a firm-target, fixed-price incentive contract, which the FAR explains as follows:

> A fixed-price incentive (firm target) contract specifies a <u>target cost</u>, a <u>target profit</u>, a <u>price ceiling</u> (but not a profit ceiling or floor), and a <u>profit adjustment formula</u>. These elements are all negotiated at the outset. The <u>price ceiling is the maximum that may be paid to the contractor</u>, except for any adjustment under other contract clauses. When the contractor completes performance, the parties negotiate the final cost, and the final price is established by applying the formula. When the final cost is less than the target cost, application of the formula results in a final profit greater than the target profit; conversely, <u>when final cost is more than target cost, application of the formula results in a final profit less than the target profit, or even a **net loss**</u>. If the final negotiated cost exceeds the price ceiling, the contractor absorbs the difference as a loss. Because the profit varies inversely with the cost, this contract types provides a positive, calculable profit incentive for the contractor to control costs.

48 C.F.R. § 16.403-1 (emphasis added). Thus, the key figures for determining the final price on firm-target, fixed-price incentive contract include the target cost, the total target profit, and the total final negotiated cost. The ASBCA determined these figures to be:

- Total Target Cost:            $17,582,184
- Total Target Profit:           $550,724
- Total Final Negotiated Cost:   $22,738,540

These figures are largely undisputed.[2] The only dispute as to these figures, which is

---

[2] These figures were the result of modifications to the contract. The initial figures were as follows:
- Target Cost: $12,282,010
- Target Profit: $-0-
- Target Price: $12,282,010

3

3:12-cv-0526-GPC-WMC

discussed in connection with Count III of SMI's Complaint, pertains to the inclusion of a portion of the debt concession by Oregon's State Accident Insurance Fund ("SAIF") in determining the total final negotiated cost. In determining whether this, and other debt concessions, were creditable to the Navy, the ASBCA relied on the FAR Credits provision, FAR § 31.201-5 ("Credits Clause"), which was incorporated into the contract, and which provides:

> The applicable portion of any income, rebate, allowance, or other credit **relating to** any allowable cost and received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by cash refund.

(Emphasis added.) After the ASBCA determined the amount of the debt concessions creditable to the Navy, it was able to determine the total final negotiated cost set forth above.

Once the total negotiated final cost, total target cost, and total target profit were determined, the ASBCA plugged them into a "profit adjustment formula" to determine the total final price of the contract, which, in no event, was to exceed the ceiling price.[3] In this case, the adjustment formula comes from another standard FAR provision that was also incorporated into the contract, namely, the Incentive Price Revision–Firm Target provision, FAR § 52.216-16 ("IPR Clause").

The IPR Clause provides that, after receiving a contractor's final statement of costs, the contracting officer shall promptly establish the total final price as follows:

> (a) General. The supplies or services identified in the Schedule as Items 0001, 0005, 0009 [are] subject to price revision in accordance with this clause; provided that in no event shall the total final price of these items exceed the ceiling price of one hundred thirty (130%) percent of the target

---

   NW Marine initially offered to perform the contract for zero profit because it never expected to perform the contract at the initial target cost. (A47.) Rather, NW Marine expected it would be able to perform the Contract at the ceiling price (i.e., 130% of the initial target cost). (Id.) Given this bidding strategy, "both parties expected an eventual increase in the billing price from target cost." (A48.)

   [3] The original ceiling price was set at $15,996,613. Through the modifications referenced in footnote 2, the ceiling price was ultimately raised to $23,295,755. NW Marine was paid for its costs up to this ceiling price. Though, for purposes of applying the IPR Clause's adjustment formula, the ceiling price was determined to be $22,856,839. These amounts are not in dispute.

cost for these Items . . . .

* * *

(d) Price Revision. Upon the Contracting Officer's receipt of the data required by paragraph (c) above, the Contracting Officer and the Contractor shall promptly establish the total final price of the items specified in (a) above by applying to final negotiated cost an <u>adjustment for **profit or loss**</u>, as follows:

> (1) On the basis of the information required by paragraph (c) above, together with any other pertinent information, the parties shall negotiate the total final cost incurred or to be incurred for supplies delivered (or services performed) and accepted by the Government and which are subject to price revision under this clause.
>
> (2) The total final price shall be established by applying the total final negotiated cost an <u>adjustment for **profit or loss**</u>, as follows:

* * *

>> (ii) <u>If the total final negotiated cost is greater than the total target cost, the adjustment is the total target profit, less thirty (30) percent of the amount by which the total final negotiated cost exceeds the total target cost.</u>

(A4-5); 48 C.F.R. § 52.216-16 (emphasis added).

Because the total final negotiated cost ($22,738,540) was greater than the total target cost ($17,582,184), the ASBCA took the total target profit ($550,724) into consideration and applied the adjustment formula set forth in subsection (d)(1)(2)(ii) of the IPR Clause as follows:

Total Final Price = Total Final Negotiated Price + (Total Target Profit – (.3(Total Final Negotiated Price – Total Target Cost))

Total Final Price = $22,738,540 + ($550,724 – (.3($22,738,540 – $17,582,184))

Total Final Price = $22,738,540 + ($550,724 – (.3($5,156,356))

Total Final Price = $22,738,540 + ($550,724 – $1,546,906)

Total Final Price = $22,738,540 – $996,183

Total Final Price = $21,742,357

The ASBCA then subtracted the total final price ($21,742,357) from the ceiling price ($22,856,839), accounted for amounts retained by the Navy ($10,003), and finally

reached a total of **$1,104,479** as the amount due to the Navy as a result of NW Marine's debt concessions. While a portion of the Total Final Negotiated Price is disputed as to the SAIF debt concession, these calculations are not in dispute.

The ASBCA then relied on subsection (g) of the IPR Clause to award the Navy interest from August 14, 1989. This subsection provides:

> (g) Quarterly limitation on payments statement. This paragraph (g) shall apply <u>until final price revision under this contract has been completed</u>.
>
> (1) Within 45 days after the end of each quarter of the Contractor's fiscal year in which a delivery is first made (or services first performed) and accepted by the Government under this contract, and for each quarter thereafter, the Contractor shall submit to the contract administration office . . . a statement, cumulative from the beginning of the contract, showing–
>
> (i) The total contract price of all supplies . . . for which final prices have been established;
>
> (ii) The total costs (estimated to the extent necessary) reasonably incurred for, and properly allocable solely to, the supplies delivered (or services performed) . . . for which final prices have not been established;
>
> (iii) The portion of the total target profit . . . that is in direct proportion to the supplies delivered (or services performed) . . . for which final prices have not been established–increased or decreased in accordance with subparagraph (d)(2) above, when the amount stated under subdivision (ii), immediately above, differs from the aggregate target costs of the supplies or services; and
>
> (iv) The total amount of all invoices or vouchers or supplies delivered (or services performed) . . . .
>
> (2) Notwithstanding any provision of this contract authorizing greater payments, <u>if on any quarterly statement the amount under subdivision (1)(iv) above exceeds the sum due the Contractor, . . . the Contractor shall immediately refund or credit to the Government the amount of this excess</u>. . . .
>
> (3) <u>If the Contractor fails to submit the quarterly statement within 45 days after the end of each quarter</u> and it is <u>later determined</u> that the <u>Government has overpaid the Contractor, the Contractor shall repay the excess to the Government immediately. Unless repaid within 30 days after the end of the statement submittal period, the amount of the excess shall bear interest</u>, computed from the date the quarterly statement was due to the date of repayment, at the rate established in accordance with the Interest clause.

(Emphasis added.) The ASBCA applied subsection (g) to award the Navy interest

upon the reimbursement amount because no quarterly statement was submitted in 1989 when NW Marine obtained the debt concessions and because it has been "later determined" that the Navy overpaid NW Marine.[4]

## JURISDICTION

Jurisdiction over this case arises under 41 U.S.C. §§ 7101-7109 of the Contract Disputes Act, which provide that the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918, and the Public Vessels Act, 46 U.S.C. §§ 31101-31113, govern claims arising out of maritime contracts against the government and "preserve the traditional exclusive jurisdiction of the federal district courts over admiralty or maritime cases." L-3 Servs., Inc. v. United States, 104 Fed. Cl. 30, 33 (Fed. Cl. 2012); 28 U.S.C. § 1333 (providing exclusive federal district court jurisdiction for "any civil case of admiralty or maritime jurisdiction").

## STANDARD OF REVIEW

Because Congress clearly provided for judicial review under the Contract Disputes Act, the provisions of the Contract Disputes Act trump the default provisions for judicial review under the Administrative Procedure Act. Bowen v. Massachusetts, 487 U.S. 879, 903 (1988) ("When Congress enacted the [Administrative Procedure Act] to provide a general authorization for review of agency action in the district courts, it did not intend that general grant of jurisdiction to duplicate the previously established special statutory procedures relating to specific agencies"); Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1574-75 (Fed. Cir. 1995) ("The [Contract Disputes Act] dictates the standards this court applies in reviewing decisions of agency contract appeal boards").

The Contract Disputes Act provides that, on appeal, "the decision of the agency board on a question of law is not final or conclusive," but "the decision of the agency board on a question of fact is final and conclusive and may not be set aside unless the

---

[4] It is undisputed that, even though subsection (g) applies until final price revision under the contract was completed, NW Marine ceased submitted quarterly statements in 1987 after completing work on the Duluth.

[finding] is . . . [1] fraudulent, arbitrary, or capricious; . . . [2] so grossly erroneous as to necessarily imply bad faith; or . . . [3] not supported by substantial evidence." 41 U.S.C. § 7107(b).

Although courts review ASBCA conclusions of law without deference, the ASBCA's legal interpretations are generally "given careful consideration because of its expertise in interpreting government contracts." White v. Edsall Const. Co., Inc., 296 F.3d 1081, 1084 (Fed. Cir. 2002). Only minimal deference, however, is due with regard to the ASBCA's interpretations of the FAR. See Perry v. Martin Marietta Corp., 47 F.3d 1134, 1137 (Fed. Cir. 1995) ("[W]hile an agency's interpretation of its own regulations is normally entitled to considerable deference, such deference is not required here because the FAR and the underlying CAS are not regulations of the Department of Defense." (citations omitted)).

Summary judgment is the appropriate vehicle in the Ninth Circuit for reviewing an administrative agency's final determination. See Nw. Motorcycle Ass'n v. U.S. Dept. of Agriculture, 18 F.3d 1468, 1472 (9th Cir. 1994).

## ISSUES ON APPEAL

In its Complaint and Cross-Motion, SMI claims the ASBCA decision awarded the Navy "an unexpected and inequitable windfall and is based on an overly literal and incorrect interpretation" of the Contract. SMI contends this Court should reverse the ASBCA's decision because the ASBCA:

1. erred in interpreting and applying the IPR Clause's final price adjustment formula;
2. erred in awarding interest under the IPR Clause's quarterly statement provision; and
3. erred in including a debt concession by Oregon's State Accident Insurance Fund ("SAIF") in calculating the cost reimbursement due to the Navy.

///

# DISCUSSION

## I. IPR Clause

The ASBCA applied the adjustment formula set forth in the IPR Clause according to its plain language, resulting in a total reimbursement amount of $1,104,479. (A26.) This adjusted reimbursement amount means that, even after taking into account the debt concessions, NW Marine will have performed the contract at a net loss.

SMI challenges the ASBCA's interpretation and application of the IPR Clause in Count I of its Complaint. (Compl. ¶¶ 43-56.) SMI contends the terms "profit" and "loss" in the IPR Clause are ambiguous and that the ASBCA erred by refusing to consider "the contract as a whole, the parties' reasonable expectations and course of performance, and the policy considerations [underlying firm-target, fixed-price incentive contracts]." Then, relying on its assertion that the terms "profit" and "loss" are ambiguous, SMI contends the IPR Clause should be interpreted in a way that would not result in a "negative profit" or "penalty" to NW Marine (so long as its costs remained below the ceiling price), but instead in a way that would ensure NW Marine would be paid for its costs up to the ceiling price. SMI contends that a mechanical reading and application of the IPR Clause leads to an absurd and inequitable result.

The Navy, on the other hand, asserts the ASBCA applied the IPR Clause without error. The Navy asserts the IPR Clause is unambiguous and should be applied as the ASBCA applied it, notwithstanding the result being that NW Marine would suffer a net loss on the contract. The Navy asserts SMI's proffered extrinsic evidence is immaterial to interpreting and applying the IPR Clause, given that it is derived from a federal regulation. The navy assert regulations incorporated into a contract should be interpreted according to the intent of the regulation's drafters—not the parties to the contract.

The Court first addresses SMI's contention that the ASBCA should have considered extrinsic evidence as to the parties' expectations and course of performance.

Having considered this argument, the Court agrees with the Navy that, when interpreting a provision from the FAR that is incorporated into a contract (such as the IPR Clause), courts look to the rules of statutory, rather than contract, interpretation. See e.g., Raytheon Co. v. United States, 105 Fed. Cl. 236, 255 (Fed. Cl. 2012) ("Because the . . . agreement is taken directly from [the] FAR . . ., the court agrees . . . that it must construe the provision to effectuate the intent of the promulgators and not the parties . . . . The fact that the regulatory language is contained in a contract does not change its interpretation.").

SMI provides no authority, and the Court has found none, to support SMI's assertion that the parties' intentions, understandings, prior negotiations, or course of performance are relevant in interpreting and applying regulatory language incorporated into a contract. The Court therefore rejects SMI's argument that the ASBCA erred by refusing to consider "the contract as a whole, the parties' reasonable expectations and course of performance" in interpreting and applying the IPR Clause. It may be, however, that—if the IPR Clause is deemed ambiguous—the ASBCA erred by failing to consider (under the rules of statutory interpretation) the policy considerations underlying firm-target, fixed-price incentive contracts. The Court thus proceeds to addressing SMI's argument that the IPR Clause is ambiguous.

When interpreting a statute, courts "look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress." Nw. Forest Res. Council v. Glickman, 82 F.3d 825, 830 (9th Cir. 1996). "When statutory language is clear and unambiguous, . . . a judicial inquiry into the meaning of the statute ends." United States v. Molinaro, 876 F.2d 1432, 1433 (9th Cir. 1989) (per curiam). When statutory language is ambiguous, courts "may consider extrinsic evidence of the legislature's intent." In re First T.D. & Inv., Inc., 253 F.3d 520, 527 (9th Cir. 2001).

Statutory terms should be "construed consistently with their everyday meaning, including by reference to the dictionary absent statutory definition or definitive clue."

Natural Res. Def. Council, Inc. v. Winter, 518 F.3d 658, 681 (9th Cir. 2008), rev'd on other grounds, 555 U.S. 7 (2008), (citing Watson v. United States, 552 U.S. 74, 79 (2007)). Courts should avoid interpretations that "would produce absurd results." Ma v. Ashcroft, 361 F.3d 553, 558 (9th Cir. 2004) (citing United States v. Wilson, 503 U.S. 329, 334 (1992)).

SMI's argument that the IPR Clause is ambiguous stems largely from its reading of the statutory description of firm-target, fixed-price incentive contracts as set forth in FAR § 16.403-1. Relying on this description, SMI argues such contracts operate to, on one hand, provide the contractor with a profit incentive for keeping costs at or below the initially agreed-upon target cost, while, on the other hand, capping the government's potential liability on the contract through the initially agreed-upon ceiling price. SMI argues that, given this scheme, a contractor can never suffer a loss unless it exceeds the ceiling price, and, even then, the contractor's loss would be limited to the amount by which it exceeded the ceiling price. Then, on the basis of these arguments, SMI argues the words "loss" and profit (as used in the IPR clause) and the words "loss" and "net loss" (as used in the contract description) must be ambiguous because a mechanical application of the IPR Clause results in NW Marine incurring a net loss on the contract even though it never exceeded the ceiling price.

In the first instance, the Court notes that the contract description is merely that: a description. The Court nonetheless considers the contract description given its place in the same regulatory scheme from which the IPR Clause is derived.

Having reviewed and considered the contract description, the Court rejects SMI's premise that a contractor can never suffer a loss under a firm-target, fixed price incentive contract unless it exceeds the ceiling price. Nothing in the contract description can be reasonably interpreted to arrive at this result.

As to the ceiling price, the contract description merely states that it "is the maximum that may be paid to the contractor" and is "not a profit ceiling or floor." FAR § 16.403-1(a) (emphasis added). In that regard, the ceiling price is intended to

protect the government, not benefit the contractor. See Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 81 (2000) ("The Government . . . was well positioned to have a ceiling on its potential liability."). SMI acknowledge as much in its Cross-motion. (ECF No. 27-1 at 17 ("The contractor has a 'positive' incentive to make a profit, while the government is protected from cost overruns by the ceiling price." (emphasis added)).) On this basis, it cannot be said that the ceiling price represents a contractor's guaranteed allowance. It is merely a cap on the government's liability.

The remainder of the contract description further supports the Court's rejection of SMI's argument that a contractor can only suffer a loss if it exceeds the ceiling price. FAR § 16.403-1 explains:

> When the contractor completes performance, the parties negotiate the final cost, and the final price is established by applying the formula. When the final cost is less than the target cost, application of the formula results in a final profit greater than the target profit; conversely, when final cost is more than target cost, application of the formula results in a final profit less than the target profit, or even a net loss. If the final negotiated cost exceeds the price ceiling, the contractor absorbs the difference as a loss.

(Emphasis added.) The use of the words "less than the target profit, **or** even a net loss" in the contract description makes clear that its drafters intended to provide for instances where a contractor may suffer a "net loss" beyond a complete diminution of the target profit.

The IPR Clause itself is similarly clear with regard to the possibility of a contractor suffering a loss. Subsection (d) of the IPR Clause provides that, after receiving the required information, the contracting officer "shall promptly establish the total final price . . . by applying to final negotiated cost an adjustment for profit or loss." Subsection (d)(2) similarly provides: "The total final price shall be established by applying the total final negotiated cost an adjustment for profit or loss . . . ." As the ASBCA observed, nothing in the IPR Clause limits a contractor's loss to costs that exceed the ceiling price.

Reading the IPR Clause in a way that permits a contractor to suffer a loss even

if the contractor keeps its costs at or below the ceiling price is consistent with the remainder of the contract description. The contract description provides that, "[b]ecause the profit varies inversely with the cost, this contract type provides a positive, calculable profit incentive for the contractor to control cost." Providing a contractor with a "positive, calculable profit incentive" is not mutually exclusive with the contractor suffering a net loss if the final negotiated cost exceeds the target cost by so much that, not only is the contractor's target profit completely depleted, but, in fact, the contractor begins to absorb its excess costs as a net loss. This inverse relationship between a contractor's costs and any potential profit or loss is irrelevant to the ceiling price.

Moreover, NW Marine assumed the risk of incurring a net loss when it opted to perform the contract at what was a "considerably understated" initial target cost, realizing all along that it would only ever be able to perform the contract at or above the initial ceiling price. (A47.) In this regard, the Court finds it is not absurd for NW Marine to have suffered a net loss per its failure to control costs. Conversely, had NW Marine controlled its costs and performed below its target cost, the Navy would have been on the hook for paying NW Marine a final profit greater than the target profit. As the Northrop court concluded, this is a reasonable apportionment of the risks. See 47 Fed. Cl. at 48.

Because the Court rejects SMI's premise that a contractor can never suffer a loss unless it exceeds the ceiling price, the Court does not reach SMI's ultimate contention that the terms "profit" and "loss" are ambiguous as used in the IPR Clause. Rather, the Court concludes the ASBCA's interpretation and application of the IPR Clause was without error.

**II.   Interest**

The ASBCA awarded the Navy interest on the reimbursement amount, accruing from August 14, 1989, through the date of payment, pursuant to subsection (g) of the IPR Clause. (A32-34.)

SMI challenges the ASBCA's interest award in Count II of its Complaint. (Compl. ¶¶ 57-70.) SMI argues the ASBCA erred in determining "the debt concessions made by [NW Marine] in April 1989 were a 'major event' that triggered a requirement for [NW Marine] to file a quarterly statement for the period ending June 30, 1989 restating Contract costs to provide the credits [finally] determined by the ASBCA in June 2011." (Id. ¶¶ 62-63.) Said another way, SMI argues "[t]he IPR Clause cannot be read to require cost statements be made three years after contract completion to reflect credits not determined to exist, or quantified, until many years after June 30, 1989."

SMI further asserts that, in accordance with FAR's Cost Accounting Standard 401, NW Marine never recorded the debentures awarded to its creditors during bankruptcy proceedings as contract costs; thus, the subsequent debt concessions could not have changed NW Marine's recorded costs. In other words, SMI argues it should be insulated from the ASBCA's award of interest because Cost Accounting Standard 401 prevents SMI from allocating costs differently than the manner in which NW Marine originally (and, as later determined, incorrectly) recorded them.[5]

The Navy asserts subsection (g) of the IPR Clause required NW Marine to submit quarterly statements after performance began until final price revision under contract has been completed. The Navy contends that, because NW Marine stopped submitting quarterly statements in April 1987, the Navy is entitled to recover interest on whatever amount is finally deemed reimbursable to the Navy.

FAR § 52.216-16 provides that subsection (g) "shall apply until final price revision under this contract has been completed." Subsection (g)(1) further explains that, "[w]ithin 45 days after the end of each quarter . . . in which . . . services are first performed . . . , and <u>for each quarter thereafter</u>, the Contractor shall submit . . . a

---

[5] SMI also contends the ASBCA erred in awarding interest because no refund is due to the Navy until after the final price is established. (Id. ¶¶ 68-70.) The provision of the IPR Clause SMI relies on for this proposition, however, refers to an inapplicable section of the IPR Clause pertaining to contract modifications. See FAR § 52.216(f)(3).

statement." (Emphasis added.) The Court therefore agrees with the Navy that subsection (g) applies until final price revision has been completed, and that final price revision here has yet to occur.

On one hand, the Court agrees with SMI that the words "major event" do not appear in subsection (g), and, therefore, a "major event" (however defined) could not have triggered the obligation to file a quarterly statement. This, however, misses the point that the requirements of subsection (g) requires no trigger at all, so long as final price revision is incomplete. The plain language of subsection (g) requires quarterly statements to be filed until final price revision is complete. Thus—given the controversy surrounding the debt concessions and the potential accrual of interest under subsection (g)—it is unclear why NW Marine and then SMI would not comply with the plain language of this provision.

Subsection (g)(3) provides: "If the Contractor fails to submit a quarterly statement within 45 days after the end of each quarter and it is later determined that the Government has overpaid the Contractor, the Contractor shall repay the excess immediately." FAR § 52.216-16(g)(3). Subsection (g)(3) goes on: "Unless repaid within 30 days after the end of the statement submittal period, the amount of the excess shall bear interest."

Here, it is undisputed that NW Marine and then SMI "fail[ed] to submit a quarterly statement within 45 days after the end of each quarter." It is also undisputed that it has been "later determined" that the Navy overpaid NW Marine in light of the debt concessions. It is further undisputed that the amount of this overpayment has not been finally determined and may not, given the possibility of appeals following this Order, be finally determined for quite some time.

Applying subsection (g)(3) to these, the Court finds it is unclear whether interest begins to accrue 30 days following the end of the statement submittal period in which NW Marine originally obtained the debt concessions (i.e., the second quarter of fiscal year 1989), or 30 days following the end of the submittal period in which the amount

of the overpayment is finally determined (i.e., at some point in the future). In this regard, SMI persuasively argues that, even if it had submitted a quarterly statement following the second quarter of fiscal year 1989, it is unclear what would have been included on that statement.

Subsection (g) requires quarterly statements to show: (1) the total price of all services performed for which final prices have been established; (2) total costs incurred for, and properly allocable solely to, the services performed and for which final prices have not been established; (3) the total profit due as increased or decreased according to the IPR adjustment formula in subsection (d)(2); and (4) the running total amount of all invoices. FAR § 52.216-16(g)(1).

Thus, had a quarterly statement been submitted following the second quarter of fiscal year 1989, it is unclear which of the foregoing categories the debt concessions would have fallen under. Perhaps they could have been included under category (2) as a decrease in costs for which final prices have not been established. Even if the debt concessions fell under category (2), however, the portion of the debt concessions that is "properly allocable solely to" performance on the Duluth was only recently determined by the ASBCA upon remand from the Ninth Circuit. This determination, however, is not final. Indeed, as discussed below, SMI challenges the ASBCA's inclusion of the SAIF debt concession in Count III of its Complaint.

Based on the foregoing, the Court finds it would be absurd to read subsection (g) as requiring the accrual of interest on an amount that has yet to be finally determined. See Ma, 361 F.3d at 558 (stating that courts should avoid statutory interpretations that "would produce absurd results"). The Court instead reads subsection (g)(3) has requiring the accrual of interest on overpayments not repaid within 30 days following the statement submittal period for the quarter in which the amount of any overpayment is finally determined. Accordingly, the Court finds the ASBCA erred in determining that the Navy is entitled to interest on the reimbursement amount from August 14, 1989, through the date of repayment.

## III. SAIF Debt Concession

Among other debt concessions obtained by NW Marine, was a debt concession from SAIF, Oregon's workers compensation insurance fund. The ASBCA determined the debt concession was properly booked (per accounting standards) in fiscal year 1986, even though SAIF conceded the debt in fiscal year 1989. The ASBCA further determined, under the Credits Clause, (see p.4, supra), that a portion of the SAIF debt concession related to NW Marine's work on the Duluth in 1986 and was therefore creditable to the Navy. (A21.)

SMI challenges the ASBCA's decision to include the SAIF debt concession in the amount creditable to the Navy in Count III of its Complaint. (Compl. ¶¶ 71-77.) SMI contends the ASBCA erred by including the SAIF debt concession because Cost Accounting Standard 416 required NW Marine to book the debt concession as a "refund" of premiums in 1989, when the "adjustment to premium costs" occurred.

The Navy contends that, whether the SAIF debt concession was booked in 1986 or 1989 is irrelevant, as the only question in determining whether the debt concession is creditable to the Navy is whether the debt concession "relates to" allowable costs under the contract. The Navy argues that, because the contract is still open and subject to final price revision, it should make no difference when the debt concession was booked. The Court agrees with the Navy.

The Credits Clause provides: "The applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by cash refund." 48 C.F.R. § 31.201-5 (emphasis added). Cost Accounting Standard 416 provides: "The premium cost applicable to a given policy term shall be assigned pro rata among the cost accounting periods covered by the policy term," and "[a] refund . . . shall become an adjustment to the pro rata premium costs for the earliest cost accounting period in which the refund . . . is actually or constructively received." 48 C.F.R. § 9904.416-50(a)(1)(ii) (emphasis added).

It is thus clear that the Credits Clause and Standard 416 do not conflict with one another. That is, regardless of whether the SAIF debt concession was booked in accordance with Standard 416, it still "relat[es] to an[] allowable cost" for which NW Marine was paid by the Navy, namely, the insurance costs NW Marine incurred while performing the contract.

Even if Standard 416 somehow prevented the SAIF debt concession from being included in the amount determined to be creditable to the Navy, the Court agrees with the ASBCA's finding that the debt concession was not a "refund" for purposes of Standard 416. Instead, SAIF merely forgave a previously agreed to premium that NW Marine never paid to SAIF in the first place. As such, the Court finds the ASBCA did not err by including the SAIF debt concession in the amount determined to be creditable to the Navy. Accordingly, the total final negotiated cost used by the ASBCA in applying the IPR Clause, which took the SAIF debt concession into consideration, (see pp. 3-4, supra), was determined without error.

## CONCLUSION & ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1. The Navy's Motion for Summary Judgment, (ECF No. 22), is **GRANTED** as to Counts I and III of SMI's Complaint and **DENIED** as to Count II of SMI's Complaint;

2. SMI's Cross-motion for Summary Judgment, (ECF No. 27), is **DENIED** as to Counts I and III of SMI's Complaint and **GRANTED** as to Count II of SMI's Complaint;

3. The Clerk of Court shall therefore enter **FINAL JUDGMENT** as follows: The ASBCA's determination that the quantum due to the Navy is $1,104,479 is **AFFIRMED**. The ASBCA's determination that the Navy is owed interest on this amount from August 14, 1989, through the date of repayment is **REVERSED**. Interest on the quantum due to the Navy will begin to accrue if the quantum due to the Navy is not repaid to the

| | |
|---|---|
| 1 | Navy within 30 days following the statement submittal period for the |
| 2 | quarter in which the quantum is finally determined. |
| 3 | DATED:  February 19, 2014 |

HON. GONZALO P. CURIEL
United States District Judge